## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| INFOVISA, INC., | ) | Case No.: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND DEMAND** |
| | ) | **FOR JURY TRIAL** |
| ROCKLAND TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW, the Plaintiff, INFOVISA, Inc., by and through its undersigned counsel, and for its Complaint against the Defendant, Rockland Trust Company, states and alleges as follows:

### PARTIES

1. Plaintiff, INFOVISA, Inc. ("Infovisa"), is a Colorado corporation with its principal place of business in Cornelius, North Carolina.

2. Defendant, Rockland Trust Company ("RTC"), is a bank and trust company organized and existing under the laws of the State of Massachusetts, with its principal place of business in Rockland, Massachusetts.

### JURISDICTION AND VENUE

3. Subject matter jurisdiction is proper in this case pursuant to 28 U.S.C. § 1332. The amount in controversy herein exceeds $75,000.00.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### FACTUAL BACKGROUND

5.  Infovisa is a software company that specializes in providing software and other services utilized in connection with trust accounting services for customers who, in turn, provide trust related services to their customers.

6.  RTC advertises itself as a banking and investment company doing business throughout the United States.

7.  On or about October 2, 2015, Infovisa and RTC's predecessor in interest, The Milford National Bank and Trust Company, a national banking association ("Milford Bank") entered into a Software License Agreement (the "Software License Agreement"). A true and correct copy of the Software License Agreement is attached hereto as Exhibit "A," and incorporated herein by this reference.  Pursuant to the Software License Agreement, Infovisa agreed, *inter alia*, to grant a license for use of Infovisa's software known as "MAUI" (the "Software").

8.  On or about November 16, 2018, RTC acquired Milford Bank through a merger transaction, pursuant to which Milford Bank was merged into RTC as the surviving entity and successor in interest to the Agreement (the "Merger").  As successor to Milford Bank, RTC is entitled to the benefits of and subject to the obligations of Milford Bank under the terms of the Software License Agreement.

9.  Pursuant to the third paragraph of the Software License Agreement, RTC agreed to an express exclusivity provision in which RTC agreed to use the Software "for all Client's [RTC's] trust accounts administered by Client [RTC] (the 'Accounts')."  The Software License Agreement provided that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective…successors…."

10. On or about October 25, 2018, Infovisa and RTC entered into a Systems Access and Indemnity Agreement (the "Access Agreement"), pursuant to which RTC expressly agreed in Section 8 thereof to be bound as "a party to" the Software License Agreement, and further expressly agreed as follows: "Upon the…consummation of the Merger [of Milford Bank into RTC], Rockland Trust agrees to be bound by all of the terms and provisions of the Software Agreements as a 'Licensee' thereunder and shall have the rights and obligations of a 'Licensee' as provided thereunder…." A true and correct copy of the Access Agreement is attached hereto as Exhibit "B," and incorporated herein by this reference.

11. The Software License Agreement features, in Section 2 thereof, an initial term of sixty (60) months "commencing with the first bill for monthly maintenance" and terminating on sixty (60) months after the first day of the month in which Infovisa issued the first invoice for monthly maintenance fees. Infovisa issued the first invoice for maintenance fees under the Software License Agreement in January of 2016; thus the initial and current term of the Software License Agreement continues until on or about December 31, 2020. A true and correct copy of the first invoice for maintenance fees is attached hereto as Exhibit "C," and incorporated herein by this reference.

12. Following the Merger, RTC failed, refused and neglected to use the Software for all of its accounts in accordance with the third paragraph of the Software License Agreement. Under Attachment A of the Software License Agreement, RTC agreed to pay to Infovisa a monthly fee in the amount of "a base fee of $1,400, plus one basis point (.01%) of the aggregate market value of assets held by or on behalf of Client [RTC] and processed on the Software…." Thus license fees under the express terms of the Software License

Agreement were to increase with the increase in usage of the Software on higher volumes of accounts and assets contained in accounts of RTC's customers.

13. On or about October 2, 2015, Infovisa and Milford Bank entered into a Document Management Amendment (the "Document Management Amendment"), a true and correct copy of which is attached hereto as Exhibit "D," and incorporated herein by this reference. RTC is the successor to Milford Bank pursuant to the Merger, and is bound by all provisions of the Document Management Amendment.  The Document Management Amendment amended the Software License Agreement.  Pursuant to Attachment A of the Document Management Amendment, RTC agreed to pay fees for services provided by Infovisa thereunder in an amount equal to $250.00 per month for the first 500 RTC accounts, and an additional $50.00 per month for each additional 500 account increment or portion thereof.

14. On or about October 2, 2015, Infovisa and Milford Bank entered into a Web Amendment to Software License Agreement (the "Web Amendment"), a true and correct copy of which is attached hereto as Exhibit "E," and incorporated herein by this reference.  RTC is the successor to Milford Bank pursuant to the Merger, and is bound by all provisions of the Web Amendment.  The Web Amendment amended the Software License Agreement. Pursuant to Attachment A of the Web Amendment, RTC agreed to pay fees for the services provided by Infovisa thereunder in an amount equal to $1.00 per month per active administrative and consumer user account for each user account in excess of 300.

15. At all times relevant, Infovisa diligently performed its duties pursuant to and in accordance with the Software License Agreement and the Document Management Amendment.

16. RTC has informed Infovisa that it does not intend to honor any of its payment obligations, as set forth under the Software License Agreement and/or the Document Management Amendment, and/or the Web Amendment for any unpaid or underpaid portions of the term.

17. RTC's contractually mandated fees owed to Infovisa over the course of the term of the Software License Agreement, the Document Management Amendment and the Web Amendment (collectively, the "Software License Agreement, as amended") substantially exceed $75,000.00.

## COUNT I—BREACH OF CONTRACT

18. Infovisa incorporates the allegations of Paragraphs 1 through 17 above as if fully set forth herein.

19. Under the Software License Agreement, as amended, RTC promised to pay Infovisa certain fees throughout the initial five year term and any renewal terms.

20. Infovisa has performed all conditions precedent under the Software License Agreement, as amended, and satisfied all obligations contained in the Software License Agreement, as amended. Infovisa remains ready, willing, and able to furnish its Software products and all accompanying services to RTC pursuant to the Software License Agreement, as amended.

21. By failing to use the Software for all trust accounts administered by RTC, RTC has breached the Software License Agreement, as amended.

22. By failing to pay Infovisa the fees required under the Software License Agreement, as amended, from and after the consummation of the Merger through the present date, RTC has breached the Software License Agreement, as amended.

23. By avowing that it will not pay Infovisa fees required under the Software License Agreement, as amended, for the remainder of the five year term, RTC has anticipatorily

breached the Software License Agreement, as amended, and has breached the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

24. WHEREFORE, Infovisa respectfully requests an Order:

    a.  Awarding Infovisa its actual damages in an amount to be proven at trial;

    b.  Awarding Infovisa its costs and attorney's fees;

    c.  Awarding pre-judgment interest, as allowed by law;

    d.  Awarding Infovisa any and all further and other relief the Court deems fair and just.

25. Infovisa hereby demands trial by jury in Denver, Colorado.

WHEREFORE, Plaintiff Infovisa, Inc. prays for judgment in its favor, and against Defendant Rockland Trust Company, as herein described.

Dated this 10th day of December, 2019.

Respectfully submitted,

INFOVISA, INC., Plaintiff

By: */s/ Justin J. Knight*
    Justin J. Knight, CO Bar #46987
    PERRY, GUTHERY, HAASE &
    GESSFORD, P.C., L.L.O.
    233 South 13th Street, Suite 1400
    Lincoln, Nebraska 68508
    Telephone:   (402) 476-9200
    Facsimile:   (402) 476-0094
    jknight@perrylawfirm.com
    *Attorney for Plaintiff*

EXHIBIT "A"

SOFTWARE LICENSE AGREEMENT

# SOFTWARE LICENSE AGREEMENT
## MAUI

This Software License Agreement (the "Agreement") made this the _2nd_ day of _October_, 2015, is by and among INFOVISA ("Licensor"), and The Milford National Bank and Trust Company, ("Licensee").

The terms of this Software License Agreement apply to Licensor's software known as MAUI which includes ETA (Enhanced Trust Accounting) and ETR (Enhanced Trust Reporting) (Software), which is owned by INFOVISA ("Infovisa"). INFOVISA warrants it has the right to sublicense the Software.

Client agrees to use MAUI for all Client's trust accounts administered by Client (the "Accounts") and Infovisa is agreeable to service all of the Accounts with MAUI and to provide the Services more particularly set forth herein (the "Services") upon the terms, conditions and rates of compensation more fully hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises in this document, the parties agree as follows:

1.  **Grant.** Subject to all the terms and conditions of this Software License Agreement, Licensor hereby grants the Licensee a personal, non-exclusive, non-transferable right and license to use the Software and any documents, manuals or other material provided in support of the software. No transfer of ownership is intended by this Software License Agreement.

2.  **Term.** The initial term of this Agreement shall be in force beginning on the date accepted by the President of Licensor and shall continue, unless earlier terminated as provided in this Agreement, until the date that is five (5) years following the first day of the month in which Licensor issues its first bill to Licensee for monthly maintenance of the Software.

3.  **Product Provided.** Licensor will provide an executable module in machine-readable form for that version of the software licensed to the Licensee as described in ATTACHMENT A. Licensor will provide installation, training, and maintenance of the software, along with sufficient testing to insure that the software is "up and running", is performing all specified tasks, and is functioning in accordance with Licensor's own specifications. The Licensee is not permitted to modify or re-engineer the Software without the Licensor's written consent, although any additional modifications and services not pertaining to installation of the Software requested by the Licensee may be provided for on a pay for basis by Licensor upon mutually agreeable terms. Licensor shall have a right to a copy of all modifications and all modifications shall be owned by Infovisa.

4.  **Consideration.**

    A.  **Maintenance Fees.** In consideration of the services to be performed under paragraph 9 of this Agreement, Licensee shall pay Licensor a maintenance fee (the "Maintenance Fee") for each Software Product, in the amount specified in ATTACHMENT A, for each month during the Initial Term and any Renewal Term. The Maintenance Fee shall be billed monthly in advance, and shall become due on the first (01) day of the following month. The initial maintenance fee shall be billed immediately following installation.

    B.  **License Fee.** In consideration of the license granted under paragraph 1 of this Agreement, Licensee shall pay to Licensor a one time license fee (the "License Fee") for each software product in the amount stated in ATTACHMENT A. The license fee shall be due with the acceptance of this agreement. Licensee's obligation to pay the License Fee in accordance with such schedule shall be independent of any ongoing maintenance, expenses, taxes, or other obligations of Licensor under this agreement.

    C.  **Expenses.** Licensee shall reimburse Licensor for all shipping and postage charges incurred in performing its obligations under this Agreement. Licensee shall also reimburse Licensor for any telephone charges incurred in providing maintenance services under this Agreement by means of modem access to Licensee's computer systems. Payment for all expenses to be reimbursed by Licensee under this Agreement shall become due (30) days after receipt of an itemization prepared by Licensor, which itemization shall be prepared monthly or quarterly, at Licensor's option.

_Licensee Initials_   _Infovisa Initials_

D. **Taxes.** Licensee shall pay to Licensor the amount of any sales, use, ad valorem, excise or other similar taxes, or governmental charges (excluding taxes on Licensor's gross or net income) paid or payable by Licensor as a result of the execution or performance of this Agreement or with respect to the Software Product or its use by Licensee. Such amounts shall become due thirty (30) days after billing of Licensor's invoice therefore.

E. **Confidentiality.** Licensee shall not, without Licensor's prior written consent, disclose to any third party the amount of any fees or any other charges under this Agreement, or any Schedule hereto, or any other terms of this Agreement or such Schedules, except as required by law. Licensee's obligations under this paragraph shall survive the expiration or earlier termination of this Agreement.

5.    **Interest.** Interest on all past due amounts under this Agreement shall accrue from the date due at an annual interest rate equal to the lessor of 18% per annum or the maximum interest rate permitted by law.

6.    **Acceptance/Notice.** Licensee agrees to accept the Software, and use the Software according to the instructions supplied by Licensor. Licensee shall notify the Licensor of all instances where the Licensee believes that (1) the program is not functioning, or (2) the program is not functioning in accordance with the documentation and/or manuals. For each such instance, Licensee agrees to provide notice to Licensor. Each such notice shall explain, as well as Licensee can, the step-by-step process leading up to the instance itself, any subsequent actions taken by Licensee, and the results of such action. The notice shall be completed and sent to Licensor in a reasonable time (in most cases within three (3) days after the instance first occurs).

7.    **Software from Other Vendors.** In any other instance in which the Software modifies in any way other software licensed from any other vendor, the Licensee shall be responsible for keeping a copy of the unmodified software readily available, and this unmodified copy shall be the copy of that software which shall be returned to its vendor if such is required. The Licensor assumes no responsibility with regard to the Licensee's use of any software other than its own.

8.    **Trade Secrecy.** The Licensee recognizes that the Software, Database and Documentation are trade secrets and exclusive properties of Infovisa; therefore, the Licensee shall take special care to preserve their confidentiality. In particular, the Licensee shall not sell, distribute, allow access to, or transfer, in any manner, any copy of the Software or Documentation in whatever form to any other party without the express written authorization of Licensor. **The Licensee shall not allow access to the Software or Documentation by any third parties.** The Licensee shall take care that any copies of any materials that it makes for its own use will be clearly labeled as copyrighted materials using the form,

## CONFIDENTIAL AND TRADE SECRETS MATERIALS

Notwithstanding anything in this Agreement to the contrary, it is the express intention of the parties to this Agreement that all right, title and interest of whatever nature in Licensor's users manuals, training materials, all computer programs, routines, structures, layout, report formats, together with all subsequent versions, enhancements, and supplements to said programs, all copyrights (including both source and object code) and all oral or written information relating to the Software conveyed in confidence by Licensor to Licensee pursuant to this Agreement, and all other forms of intellectual property of whatever nature is and shall remain the sole and exclusive property of the Infovisa. During the term of this Agreement and for a period of three years after termination of this Agreement or any renewal thereof, Licensee shall not directly or indirectly engage in acts to development, acquisition, or engagement of a third party to develop (collectively, "Competitive Development") any type of software which performs any function(s) performed by (or any function similar to a function performed by) the Software with an intent to use the same or sell interests in or license the same to third parties. Licensee shall give immediate written notice to Licensor of any intent or discussions on the part of Licensee to engage in Competitive Development.

Licensee Initials       Infovisa Initials

9.     **Maintenance Services.** Licensor will provide maintenance services for each Software Product during the Initial Term and any Renewal Term under the applicable Schedule in accordance with the following:

   A.   **Enhancements.** Licensor will provide Licensee with any updates, corrections and enhancements to the Software Product specified in Attachment A, which Licensor distributes without additional charge, other than expenses described in paragraph 4, to its maintenance customers generally. If Licensor distributes any option or new product for which it charges an additional fee, Licensor will make such option or new product available to Licensee on the same terms it offers generally to other maintenance customers for the Software Product.

   B.   **Program Corrections.** If the Software Program does not perform substantially as described in the Documentation, when installed and used in the operating environment, and in the manner specified in the Documentation, and if Licensee notifies Licensor of the defect, Licensor will use its best efforts to correct the defect by providing Licensee corrected code or an alternative solution. Licensor does not represent or warrant that all defects or errors will be detected or corrected.

   C.   **Telephone Support.** Licensor will provide reasonable telephone support to assist Licensee in resolving problems encountered in the use of the Program, which, in Licensor's judgement are attributable to the Program and are not adequately addressed by the Documentation. Such support will be provided during normal business hours, Eastern Time, Monday through Friday, excluding Licensor's regularly scheduled holidays.

   D.   **Cooperation of Licensee.** As a condition to Licensor's obligations under paragraphs 9B and 9C above, Licensee shall: (1) install, in accordance with Licensor's instruction, all Program updates and corrections Licensee receives from Licensor under this Agreement; (2) perform such procedures as may be described in the Documentation for the identification and resolution of problems; and (3) provide Licensor with sufficient information and assistance for Licensor to duplicate problems reported by Licensee, to determine that the problem is with the Software Product, and to determine that the problem has been corrected.

10.   **Licensee's Additional Responsibilities.**

   A.   The Licensee will provide the Licensor a contact person to be the data administrator for the Software;
   B.   The data administrator should have knowledge of investments and trust operations;
   C.   The Licensee will supply and input the comparison index information into the Software;
   D.   The Licensee will make changes to the data that has been downloaded into the Software when necessary;
   E.   The Licensee will provide at a minimum weekly backups of the software and data;
   F.   The Licensee will provide computer equipment and software to run the Maui software programs as specified in ATTACHMENT B. The Licensee will maintain computer equipment and software compatible with the Licensor's modifications and therefore, agrees to purchase new equipment and software as may reasonably be required by the Licensor.
   G.   Licensee shall reconcile, balance and confirm the accuracy of its balance amounts with respect to its (i) cash accounts, demand deposit accounts, trust checking accounts and all other accounts used in connection with Licensee's operations, on a daily basis and, (ii) balances with custodians, subcustodians and mutual fund companies in connection with Licensee's operations, on at least a weekly basis. Upon discovery of any discrepancy with respect to such balances or accounts, Licensee shall immediately research and resolve any such discrepancies. Licensor shall not be responsible for resolution of any such discrepancy.

11.   **Warranty Terms.**

   A.   **Limited Warranty.** Licensor warrants that upon installation of the Software to Licensee, the Software will perform substantially as described in the Documentation, when installed and used in the operating environment and in the manner specified in the Documentation, and the Program media and documentation will be free of material physical defects. Licensor's sole obligation with respect to the Software under this warranty shall be to provide maintenance services for correction of the defect in accordance with paragraph 9B of this Agreement. Licensor's sole obligation with respect to the defective Software or Documentation under this warranty shall be to replace the defective item. Licensor does not warrant that the Software will meet Licensee's requirements or that operation of the software will be uninterrupted or error free.
   B.   **Disclaimer.** THE FOREGOING WARRANTY IS THE ONLY WARRANTY MADE BY LICENSOR AND IS MADE IN LIEU OF ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. No employee or agent of Licensor is authorized to make any different or additional warranties to Licensee and Licensor will not be bound by any such purported warranties.

Licensee Initials          Infovisa Initials

12. **Liability for Damages.** The Licensee understands that the Licensor will not be in a position to control the use which the Licensee makes of its computer system or the other software and peripherals the Licensee uses thereon, or the procedures the Licensee employs in its computer operation. **All claims with regard to the Software by the Licensee against the Licensor must be made within one (1) year of the acceptance of the Software or any updates thereto or forever be barred.**

Except for the express warranty set forth in this Agreement, Licensor makes no representations of warranties of any nature, oral or written, express or implied regarding the Software, the documentation, the services provided under this Agreement, or any other matter, **INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.** This Agreement does not constitute a joint account either expressed or implied between Licensor and Licensee. Licensor is acting as an independent contractor and not as an agent of the Licensee organization. Any liability of Licensor to Licensee, whether for breach of this Agreement, negligence, or otherwise, shall be specifically subject to the limitations of paragraph 13, and in no event shall its liability exceed the actual amount of payments made by Licensee to Licensor during the preceeding twelve (12) months of this Agreement.

13. **Limitation of Liability.** BECAUSE SOFTWARE IS INHERENTLY COMPLEX AND MAY NOT BE COMPLETELY FREE OF ERRORS, LICENSEE IS ADVISED TO VERIFY LICENSEE'S WORK AND TO MAKE BACKUP COPIES. IN NO EVENT WILL LICENSOR BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, ECONOMIC, COVER, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE OR USER DOCUMENTATION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. LICENSOR'S LIABILITIES IN TORT CONTRACT OR OTHERWISE SHALL BE LIMITED TO CORRECTION OR REPLACEMENT, IN ACCORDANCE WITH PARAGRAPH 11, OF DEFECTIVE PORTIONS OF THE SOFTWARE PRODUCT. IN NO EVENT WILL LICENSOR BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF THIS AGREEMENT, OR ARISING OUT OF THE USE OR INABILITY TO USE ANY SOFTWARE PRODUCT OR ANY SERVICES PROVIDED HEREUNDER (INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUES, LOSS OF DATA OR CLAIMS BY THIRD PARTIES), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

14. **Site Specification.** The Licensee's use of the Software is restricted to unlimited concurrent user(s) having access to an unlimited number of accounts on the Licensee's existing database, at the site(s) at which Licensee conducts its day-to-day operations, said site(s) being located at 300 East Main Street, Milford, MA. The Software is to be used by Licensee to process accounts of Licensee only, and acknowledges that Licensor will suffer damage if Licensee permits the Software to be used to process accounts of unrelated third parties not expressly covered by this License Agreement.

Licensee grants to Licensor the right to inspect its computer operations to determine if it is in compliance with this Agreement; however, the Licensor agrees that it will act reasonably in the exercise of this right and cooperate with the Licensee to avoid disruption of its computer operations and to preserve the confidentiality of any of its files. Should Licensee be found to be using the Software in violation of this Agreement, Licensee agrees to pay any and all additional fees Licensor determines due and owing under the current fee schedule, accruing from the original date of this Agreement.

15. **Operating System/Database Specification.** Licensee recognizes the need to maintain on the microcomputer operating system software compatible with Licensor's enhancements to the Software and therefore, Licensee agrees to purchase, install and maintain new versions of the applicable operating system and database application as recommended by Licensor within the time frame specified by Licensor. Licensor shall provide reasonable notice of such upgrades to Licensee.

16. **Training and Conversion Support.** Conversion support and training in the operation of the Software will be provided by Licensor at the offices of Licensee at the time of installation, for a period of time as set forth in Appendix A. Conversion support and training days shall start at or about 8:00am, and shall end at or about 5:00pm, unless the Licensor otherwise provides. Reasonable additional training and conversion support may be provided to Licensee at the offices of Licensee upon Licensee's request. On-site training or assistance will be available solely at Licensor's discretion, and will be charged to Licensee at Licensor's normal rates plus reasonable travel expenses, including, but not limited to, meals, lodging, air or ground transportation to the site, and local transportation. Conversion support and training days commence at the time Licensor departs from Licensor's office and concludes when Licensor arrives back at Licensor's office.

 Licensee Initials    Infovisa Initials

17. **Return of Software Product.** On or before the expiration or earlier termination of this Agreement as to a Software Product, Licensee at its expense shall return such Software Product (including the original Program media and all copies of the Documentation) by delivering the same to Licensor, shall destroy or return to Licensor all copies of the Program installed or made by Licensee, and shall certify to Licensor in writing that no copies of Program or Documentation have been retained.

18. **Remedies Cumulative; No Waiver.** No remedy of Licensor contained in this Agreement shall be considered exclusive of any other remedy; but rather, each remedy shall be distinct, separate and cumulative, and in addition to any other right or remedy provided in this Agreement or by applicable law. Each such right or remedy may be pursued singularly, successively or together in the sole discretion of Licensor and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same. Licensor may waive any right or remedy available to it, but any such waiver is not continuing, is limited to the specific act or omission waived and shall not affect any other rights or remedies.

19. **Default by Licensee.** In the event Licensee fails to perform any of the obligations under this Agreement (with the exception of payment under paragraph 4 with attachments), and this failure continues for a period of ten (10) days from the date when performance should have been rendered, Licensee shall be deemed to be in default of its obligations hereunder. Failure to make any payment required under paragraph 4 of this Agreement and attachments, within 60 days from date of invoice, shall constitute a default under this Agreement.

20. **Right to Suspend Performance Without Terminating.** In the event of a default in any terms of this Agreement by Licensee, then, in addition to Licensor's right to terminate this Agreement and any other rights and remedies Licensor may have, Licensor may suspend performance of all services under this Agreement (and deny Licensee access to Software updates) until the default is cured; in such event, Licensee shall remain liable to Licensor under the terms of this Agreement, including all payments required under paragraph 4 until the default is cured.

21. **Renewal.** This Agreement shall automatically renew itself for additional successive five (5) year terms, unless at least one hundred eighty (180) days prior to the end of the original term or any renewal term, Licensee gives Licensor, or Licensor gives Licensee, written notice of its intent to cancel this Agreement at the end of the then current term.

22. **Right to Terminate; Damages Upon Termination.** In the event a default by either party shall occur hereunder, the other party may, at its option, terminate this Agreement, so long as the terminating party gives the other party written notice, by registered mail, of intent to terminate ninety (90) days prior to the date terminating party intends to terminate this Agreement. The party in default will have the right to cure the default during the 90 day notice period, and by curing said default, maintain and continue the terms of this agreement. Licensee acknowledges that Licensor will incur great initial costs and expense to install the Software and to provide training and customer support for Licensee's personnel, the recovery of said costs and expenses by Licensor are to take place over the term of this Agreement and any renewal. Therefore, in the event of default of this Agreement by Licensee, Licensee agrees to pay to Licensor an amount equal to the maintenance fees due for the remaining balance of the term of this Agreement or any renewal thereof, so that Licensor may recoup its initial costs and expenses. In addition, all Software, equipment, manuals and other property of Licensor in Licensee's possession shall immediately be returned to Licensor, at Licensee's expense. Notwithstanding the foregoing, nothing herein shall limit Licensor's legal and equitable remedies against Licensee in the event of a breach by Licensee of the terms, conditions and protective covenants contained in this Agreement, including, but not limited to, injunctive relief in the event Infovisa or Licensor's proprietary interests in the Software are threatened or infringed.

23. **Compensation in Subsequent Years.** At any time upon thirty (30) days prior written notice to Client, Infovisa, at its sole option may increase its Maintenance Fee by increasing the "Basis Point Factor" in ATTACHMENT A, without Client's specific consent. The "Basis Point Factor" may not be increased by more than ten percent (10%) per calendar year from that used in the formula to calculate the Maintenance Fee payable the previous calendar year. Notwithstanding any other provision herein to the contrary, the Maintenance Fee may not be decreased due to any factor including but not limited to decrease in the aggregate market value of trust assets which Client holds and/or manages as trustee for its customers (the "Market Value") by more than ten percent (10%) per calendar year from the Maintenance Fee payable the previous calendar year.

24. **Binding Effect; Assignability.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns. Licensee may not assign, delegate or otherwise transfer any of its or his rights, duties or obligations hereunder or interest herein without written consent of Licensor. In the event of any such assignment, delegation, or other transfer by Licensee, whether or not Licensor has consented, the Licensee shall remain liable for all amounts due hereunder and all other obligations of Licensee pursuant to this Agreement, whether the Assignor or Transferee is or may also be liable to Licensor.

---

Page 5 of 13

Licensee Initials     Infovisa Initials

Licensor may transfer or assign its rights, duties and obligations hereunder or interest herein to any entity related to Licensor by substantially similar ownership or control, or to a successor in interest pursuant to a merger, reorganization, stock sale or other transaction, without consent of user.

25. **Merger, Acquisition, Consolidation or Reorganization of Licensee.** In the event Licensee with or without notice to Licensor changes its form of business by merger, acquisition, consolidation or reorganization, Licensor may, at its option, (i) renegotiate the maintenance fee under this Agreement, to be effective on the date of the merger, acquisition, consolidation or reorganization, (ii) assess a conversion fee, or (iii) terminate this Agreement immediately.

26. **Governing Law.** This agreement shall be governed by the laws of the State of Colorado.

27. **Jurisdiction, Venue.** The parties hereto agree that, in the event either party elects to pursue legal action against the other for default of any obligation under this Agreement, such legal action shall be brought in the State of Colorado, unless Licensor, at its sole option, elects to bring action in the county and state of residence of the Licensee.

28. **Severability.** If any part of this Agreement is held void for any reason, the balance of this Agreement shall continue to be valid and binding.

29. **Violation.** Licensee agrees to take all reasonable steps necessary to ensure that none of its employees nor any related third party violate the terms of this Agreement.

30. **Merger Clause.** This Agreement and any appendices or other writings signed by both parties associated herein constitutes the entire Agreement between the parties hereto and supersedes all proposals, prior negotiations, and agreements, whether oral or written.

31. **Notices.** All notices in connection with this Agreement shall be in writing and shall be sent, in person or by first-class mail, postage prepaid, to the address for the recipient set forth by its signature below or such other address as such party may hereafter specify by notice to the other. Such notices shall be deemed given when actually delivered to the other party or, if sooner, three (3) days after mailing if mailed certified or registered mail, postage prepaid.

WITNESS the due execution hereof the day and date first written above.

DATED this the _2nd_ day of _October_, 2015.

INFOVISA, Inc.
11120 Treynorth Drive
Cornelius, NC 28031

Signed: _____

PLEASE PRINT OR TYPE:

NAME: Michael S. Dinges

TITLE: President

DATE: _10·6·15_

The Milford National Bank and Trust Company
300 East Main Street
Milford, MA 01757

Signed: _____ , VP

NAME: _Scott L. Scales_

TITLE: _Vice President_

DATE: _10/2/15_

_____ Licensee Initials    _____ Infovisa Initials

## ATTACHMENT A:
### Licensing, Maintenance Fees and Other Terms
**In consideration of the software license and maintenance, Licensee shall pay to Licensor the following fees:**

SOFTWARE PRODUCTS PROVIDED:

1. ETA – (Enhanced Trust Accounting) – trust accounting software
2. Performance Measurement Reports in MAUI
3. AMS – (Asset Management System) – portfolio realignment and modeling of mutual funds
4. MAUI Investment Manager
5. CRUT / CRAT Module
6. Qualified Plan Reporting
7. PPM – (Pension Payment Module) – pension check writing system
8. Security Pricing Interface (INFOVISA Pricing Service)
9. Fifth Third Custody Interface
10. Equity Trading Interface (Convergex, CAPIS, or ITS)
11. Proxy Interface (Broadridge)
12. Mutual Fund Trading Interface (Matrix)
13. Investment Scorecard Extract
14. Class Action Claims Interface - Broadridge
15. OFAC Reporting Service
16. FinCEN Reporting Service
17. Account Review and Risk Manager (ARRM)

LICENSE FEE:

1. $18,000.00   One time non-refundable license fee. Payment is due upon delivery of this Agreement to INFOVISA.

CONVERSION EXPENSES:

1. $0 for electronic conversion.
2. $3,500 non-refundable payment for conversion of 2 years transaction history into MAUI for use in Performance and Historical reporting. Infovisa will add an additional 3 years of transaction history into the Pre-MAUI History Grid at no additional charge.

CONVERSION TRAINING:

1. Licensee is entitled to 5 days of on-site training and conversion support as defined in Section 16 of the Agreement.
2. Licensee agrees to reimburse Licensor for reasonable travel related expenses related to the 5 days of on-site training and conversion support.
3. Additional training may be purchased at $750 per day per employee plus reasonable travel expenses based on availability of Licensor's resources.
4. Licensor shall provide Licensee ten (10) sessions of web-based instruction between the date of contract execution and the on-site training and conversion support referenced in this Agreement.
5. Additional web based training may be purchased at the then current hourly rate based on availability of Licensor's resources.

MONTHLY MAINTENANCE FEES:

1. Client shall pay to Infovisa maintenance fees on a monthly basis during the term of this Agreement a base fee of $1,400 plus an amount equal to the product of (i) one twelfth (1/12) of (ii) one basis point (.01%) of the aggregate market value of assets held by or on behalf of Client and processed on the Software; such market value of assets shall be determined and recomputed by Infovisa on the first business day of each month during the term of this Agreement. Fees for Infovisa Pricing Service and MAUIWeb Online Statements will not fall under this structure. These services are detailed separately.

   Market Value shall be determined by applying market prices as supplied by Licensor, as found in publications such as the Wall Street Journal, or the price used by Licensee to determine its own fees, to the assets accounted for or tracked in the Software. Both asset and liability positions will be included in the Maintenance Fee calculation; the absolute value of any liability position will be used in the calculation, as appropriate. For assets denominated in a foreign currency, the Market

_Licensee Initials_     _Infovisa Initials_

Value of such assets shall be determined by applying a valid currency exchange rate on the date the Market Value is calculated.

*Number 2 below is a pass through charge and is not subject to the maximum fee increases as referred to in Section 22 because Licensor does not control this cost.

2.      $35.00     Per month for Performance Index Information

3.      $15.00 per year, per account (billed monthly) for Line Item 17 of Software Products Provided – ARRM Account Review and Risk Manager, subject to $350 per month minimum charge.

The aforementioned fee schedule assumes services are provided to a single ETA processing unit located at the site at which Licensee conducts its day-to-day trust operations.  If additional sites are required in the future, additional fees will apply.

Licensee Initials          Infovisa Initials

## ATTACHMENT B
### Infovisa System Requirements

The hardware requirements for running our applications will vary dependent upon your institution's size and volume. The items below should be viewed as a starting point, which may need to be adjusted upward. Our applications are stored and executed from the server, with workstations simply utilizing an ODBC driver and shortcut. Therefore, server resources and network capacity are your most important considerations. Also, not inclusive in this list is your disaster recovery plan. You will need to plan the method and processing for backups and disaster recovery. For example, if you plan to utilize a tape backup, you would need to add that to the list of server requirements. You should select a method you are comfortable with as the implementation and support of your process will be independent of INFOVISA, Inc. If you have questions concerning these requirements, please feel free to contact us at 704-892-3270.

| Server/Network |
|---|
| <ul><li>Windows Server 2008 R2 compatible server with Windows Server 2008 R2 installed and licensed with the appropriate number of CAL's*. The most recent service packs should be applied. *By Fall, 2016, Windows Server 2012 or later must be installed.*</li><li>SQL Server 2008 R2 or later with an appropriate number of CAL's*. The most recent service packs should be applied. *By Fall, 2016, SQL Server 2012 or later must be installed.*</li><li>Connectivity – In order to effectively support your organization, it is essential that we have periodic access to your SQL Server MAUI database and the hierarchy of directories that house the MAUI software files and ancillary data. There are several options for you to provide this type of access, and these options vary over time. The decision of how to provide this access is yours, but your choice must me compatible with technology INFOVISA currently supports (which may change over time). Examples of support options include, but are not limited to, Remote Desktop Connection to the server from our external IP address with restricted access setup by qualified network personnel (preferred), and WebEx desktop sharing from the server machine. Applications such as VNC, Carbon Copy and PC Anywhere are not acceptable options for server connectivity. It is strongly recommended that a high speed internet connection be utilized rather than dial-up as service levels can often be jeopardized by a relatively slow modem connection.</li><li>Virtual servers are acceptable either through VMWare or Microsoft Hyper-V. However, be aware that SQL Server 2012 licensing can be very expensive on virtual servers.</li><li>Internet Connectivity – if your organization plans to take advantage of interfaces offered (e.g. pricing, proxy, INFOVISA's MAUIWeb hosting), you will need to have a constant connection to an ISP. And you will need to have the latest version of Microsoft's Internet Explorer installed on the server (and any workstations that need access to these services). We may ask that you open specific TCP/IP ports (beyond 80 and 443) on your firewall for outbound initiated connections.</li></ul> |

_____ Licensee Initials      Infovisa Initials

### Networked Workstations

- Windows 7 Compatible computer with Windows 7 or later installed. (MAUI is not compatible with Windows RT versions). *By Fall, 2016 all workstations must be running Windows 8 or later.*
- 1 additional Gb of hard drive space for MAUI related files
- Each workstation should be connected to a "Domain Controller" with an Active Directory installed. And each user should log on to their workstation using their own ID from said Active Directory.
- Internet Connection & E-mail – at least one of the workstations should have an internet connection in order to utilize internet technology for training. In addition, we use email extensively for bulletins and informational updates. You will need to have at least one email account, that is checked at least daily, and provide the address for that account to us so that we may add it to our bulletin e-mail list. Further, this email account must be capable of receiving attached zip files of at least 10 MB in size. WinZip should be installed on this machine in order to access any such attachment.
- Citrix and Microsoft Terminal Server deployment are also acceptable options. Allow at least 128MB per MAUI user when provisioning the server. Note that on larger deployments some activities can consume upwards of 2 GB RAM for a single user if it is available.

### Printers, Web Access, and Other Considerations

- Printers – Dependent upon the size of your institution you might elect to have the statement and check print functions sent to different printers. If you print a large number of checks, you should consider having this setup. Our customers have had a good measure of success with Hewlett Packard printers and we recommend these. Specific model numbers change often, so we recommend that you ask us or some of our other clients what printer(s) they use before making a decision. Also, we will assist you in deciding whether to have one or two printers.
- Infovisa Web Hosting Services – Subscribers to INFOVISA web hosting services will use the same software and hardware requirements to transmit data to our data center. Data transmissions are accomplished through the use of certificates and an internet connection. These transmissions are usually performed once a day, outside of business hours. The speed of the connection to your ISP will determine how much data you can move and how quickly. If you have a large database, and the transmission times become too long. We may require you to upgrade the speed of your connection to your ISP or set up a VPN to Infovisa's data center and use SQL Server replication to support your web site.

INFOVISA *Consult Microsoft licensing requirements.*

Licensee Initials            Infovisa Initials

### Hardware, Software and Other Technology Requirements

INFOVISA's pricing, webhosting, web statements, electronic trading, and OFAC / FinCEN reporting services (referred to as "Data Center Services") are made available to clients who execute this agreement and can meet the system requirements specified herein. Failure to adhere to these requirements may render these services unusable or unavailable. You are responsible for all costs unless otherwise noted.

**Internet Browser.** In order to setup, use and receive support the INFOVISA data center services, your organization must have installed the most current version of Microsoft's Internet Explorer application. This will be required to be installed on your server. INFOVISA will not be able to provide support to your organization if you are not using Microsoft's Internet Explorer. Fees quoted herein assume a certain level of support. Should your organization be unable to meet these requirements, additional setup and support fees may apply.

**Internet Access.** The services described and included in this agreement require that the machine running the pricing service as well as INFOVISA's Scheduler application has a constant ("always on") connection to the Internet. We may ask that you open specific TCP/IP ports on your firewall for outbound initiated connections from this machine to our servers. Further, we may ask that you route port 443 traffic from this server directly to our servers, without going through a proxy server. Fees quoted herein assume a certain level of support. Should your organization be unable to meet these requirements, additional setup and support fees may apply.

**Use of Certificates.** INFOVISA's data center services require the use of certificates. If it is not possible to install certificates on your machines, the services offered herein may be impossible to render. Fees quoted herein assume a certain level of support. Should your organization be unable to meet these requirements, additional setup and support fees may apply.

**Operating System.** Windows Server 2008 R2 and SQL Server 2008 R2 are required to be on the server housing the MAUI accounting software. Licensee agrees to meet Licensor's configuration specifications and upgrade patterns to allow data transmission to occur. As referenced in the MAUI License Agreement, client agrees to upgrade operating system or SQL Server version as required to continue these services.

**MAUI Software.** The services described and included in this agreement requires Licensee to remain current on releases of MAUI software as required by Licensor. Failure to upgrade when requested may render data center services unavailable.

**Use of Adobe.** In order to setup and use INFOVISA's web statements through the MAUI Webhosting product; the most current full version of Adobe must be installed on the machine that will be printing the statements to the MAUI database.

**Anti-Virus Software.** Licensee shall install, configure and maintain current anti-virus protection software and definitions on the server housing the data transmitted to Licensor as well as on any PC's that connect to the PC's of Licensor.

*<<Signature Page Follows>>*

Licensee Initials          Infovisa Initials

The Milford National Bank and Trust Company
300 East Main Street
Milford, MA   01757

LICENSEE:

SIGNATURE:  _____ vp _____   DATE:  10/2/15

PRINTED NAME:  Scott L. Sinks _____   TITLE:  Vice President

Licensee Initials        Infovisa Initials

## ATTACHMENT C:
### Addendum and Definitions

This Addendum modifies and supplements the Software License Agreement of this date between INFOVISA, Inc. and **The Milford National Bank and Trust Company** (the "License Agreement"). Defined terms in the License Agreement have the same meaning in this Addendum.

The License Agreement is hereby modified and supplemented as set forth below. In the event of a conflict or inconsistency which cannot be harmonized, the provisions of this Addendum shall be controlling.

The terms of this Software License Agreement apply to Licensor's software known as MAUI (Multiple Application User Interfaces) which includes ETA (Enhanced Trust Accounting), which is owned by Infovisa ("Infovisa"). INFOVISA warrants it has the right to sublicense the Software.

1.      Section 22 (Right to Terminate: Damages upon Termination) shall be replaced in its entirety as follows:

**Right to Terminate; Damages Upon Termination.** In the event a default by either party shall occur hereunder, the other party may, at its option, terminate this Agreement, so long as the terminating party gives the other party written notice, by registered mail, of intent to terminate **sixty (60)** days prior to the date terminating party intends to terminate this Agreement. The party in default will have the right to cure the default during the 60 day notice period, and by curing said default, maintain and continue the terms of this agreement. Licensee acknowledges that Licensor will incur great initial costs and expense to install the Software and to provide training and customer support for Licensee's personnel, the recovery of said costs and expenses by Licensor are to take place over the term of this Agreement and any renewal. Therefore, in the event of default of this Agreement by Licensee, Licensee agrees to pay to Licensor an amount equal to the maintenance fees due for the remaining balance of the term of this Agreement or any renewal thereof, so that Licensor may recoup its initial costs and expenses. In addition, all Software, equipment, manuals and other property of Licensor in Licensee's possession shall immediately be returned to Licensor, at Licensee's expense. Notwithstanding the foregoing, nothing herein shall limit Licensor's legal and equitable remedies against Licensee in the event of a breach by Licensee of the terms, conditions and protective covenants contained in this Agreement, including, but not limited to, injunctive relief in the event Infovisa or Licensor's proprietary interests in the Software are threatened or infringed.

Licensee Initials          Infovisa Initials

EXHIBIT "B"


SYSTEMS ACCESS AND INDEMNITY AGREEMENT

Infovisa Comments of October 22, 2018
CONFIDENTIAL

## SYSTEMS ACCESS AND INDEMNITY AGREEMENT

THIS SYSTEMS ACCESS AND INDEMNITY AGREEMENT (this "Agreement"), dated and effective as of October [●25], 2018 (the "Effective Date"), is made by and among The Milford National Bank and Trust Company, a national bank ("Milford National"), Rockland Trust Company, a Massachusetts-chartered trust company ("Rockland Trust"), and Infovisa, Inc. ("Infovisa").

## RECITALS:

WHEREAS, Independent Bank Corp. ("Independent"), Rockland Trust, MNB Bancorp ("MNB"), and Milford National have previously entered into an Agreement and Plan of Merger, dated as of May 29, 2018 (the "Merger Agreement"), pursuant to which MNB will merge with and into Independent, with Independent as the surviving entity (the "Merger"), and Milford National will immediately thereafter merge with and into Rockland Trust, with Rockland Trust as the surviving entity (the "Bank Merger");

WHEREAS, the closing of the Merger, the Bank Merger and the other transactions contemplated by the Merger Agreement (the "Closing") are scheduled to take place in the fourth quarter of 2018;

WHEREAS, Milford National is currently a party to the agreements set forth on Schedule I hereto with Infovisa (together with any schedules, annexes or addenda in support of or amendments thereto, the "Software Agreements");

WHEREAS, Rockland Trust has requested the right to obtain access to the systems, software and services provided by Infovisa to Milford National pursuant to the Software Agreements (the "Systems Access"); and

WHEREAS, in order to induce Infovisa to provide the Systems Access to Rockland Trust prior to the Closing, Rockland Trust has agreed to indemnify Milford National and Infovisa, as applicable, in connection with the Systems Access as set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. Systems Access Granted. Infovisa agrees that Rockland Trust may have the Systems Access, in all cases subject to the terms and conditions of, and pursuant to, the Software Agreements. During the Term (as defined herein) of this Agreement, Rockland Trust and any of its employees, contractors, or agents may only take actions in connection with or utilize only the following services as part of the Systems Access: "View Only" and "Printing Reports" (together, the "Permitted Actions"); provided, however, that no contractor or agent of Rockland Trust shall have any Systems Access of any type or nature if such contractor or agent competes with Infovisa in the trust accounting software or services business or provides services or products to any such competitor.

2.      Prohibited Actions.  During the Term of this Agreement, Rockland Trust and any of its employees, contractors, or agents shall not take any action that is not a Permitted Action in connection with or utilize any of the following services as part of the Systems Access, including, but not limited to, "Processing and Posting of Receipts and Disbursements", "Trade Execution and Settlement", "Account Maintenance", "Processing Corporate Actions", or "Processing Class Actions" (together, the "Prohibited Actions").  Rockland Trust and its employees, contractors and agents shall take Permitted Actions or avail themselves of Systems Access solely for the purpose as permitted in this Agreement and the Software Agreements.

3.      Indemnification.  Rockland Trust assumes all risk associated with the Systems Access and agrees to indemnify, defend, and hold Milford National and Infovisa, as applicable, and their respective officers, directors, shareholders, employees and agents (collectively, the "Indemnified Parties") harmless from and against any action, claim, suit, or demand, loss, cost or expense of any kind or nature (including reasonable attorneys' fees and expenses) on account of any loss, damage or injury to any of the Indemnified Parties by reason of any Permitted Acts, Prohibited Action or any other act, omission or negligence by Rockland Trust or any of its employees, contractors, or agents in connection with the Systems Access during the term of this Agreement; *provided, however*, the foregoing indemnity will not apply to (a) any loss, liability, cost, or expense to the extent arising directly from or related to the intentional or negligent acts or omissions of the particular Indemnified Party seeking indemnity or that Indemnified Party's employees, contractors, or agents.

4.      Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nebraska, without regard to principles of conflicts of law.

5.      Entire Agreement.  This Agreement constitutes the entire agreement of the parties with respect to its subject matter and may not be amended or modified except by a writing signed by all parties.  The provisions of this Agreement are binding upon and shall inure to the benefit of, and are for the sole benefit and protection of the parties, and their respective heirs, successors and permitted assigns and shall not be construed to be for the benefit of any other person or persons.  This Agreement shall not be assigned by any party hereto without the prior written consent of both the other parties hereto.

6.      Counterparts.  This Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

7.      Electronic Copies.  The exchange of executed copies of this Agreement by facsimile or Portable Document Format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties for all purposes, and signatures of the parties transmitted by facsimile or Portable Document Format (PDF) shall be deemed to be their original signatures for all purposes.

8.      Term.  Subject to the terms and conditions hereof, the parties agree that Infovisa will provide Rockland Trust with the Systems Access commencing on the date hereof, through and including the date (the "Termination Date") of the first to occur of (i) the Effective Time (as

defined in the Merger Agreement) and consummation of the Merger under the Merger Agreement, (ii) the termination of the Merger Agreement (the "Term"), or (iii) December 31, 2018. Upon the Effective Time of the Merger, Rockland Trust shall, by operation of law, become a party to the Software Agreements, and this Agreement shall be terminated. Rockland Trust shall give written notice to Infovisa (as provided in the Software Agreements) promptly following the Effective Time and consummation of the Merger. Upon the Effective Time and consummation of the Merger, Rockland Trust agrees to be bound by all of the terms and provisions of the Software Agreements as a "Licensee" thereunder and shall have the rights and obligations of a "Licensee" as provided thereunder; Rockland Trust agrees at such time to execute a joinder agreement formalizing its joinder as a party to the Software Agreements, all in such form and substance as Infovisa may reasonably require.

9.    Fees. Nothing contained herein requires Infovisa to provide assistance at its own cost or expense for activities, assistance, consulting or other work related to the Merger or the granting                    of                    System                    Access.

3

## SCHEDULE I

Software License Agreement, dated October 2, 2015, between Infovisa, Inc. and The Milford National Bank and Trust Company, together with any schedules, annexes or addenda in support of or amendments thereto

IN WITNESS WHEREOF, the parties hereto have caused this Systems Access and Indemnity Agreement to be executed in counterparts by their duly authorized officers, all as of the day and year first above written.

THE MILFORD NATIONAL BANK AND TRUST COMPANY

By: _____, VP

Name: Scott L. Scales

Title:   Vice President

ROCKLAND TRUST COMPANY

By: _____

Name:   Todd H. Maddock

Title:   Vice President

INFOVISA, INC.

By: _____

Name:   Michael Dirga

Title:   President

*[Signature Page for Software Access and Indemnity Agreement]*

EXHIBIT "C"

INFOVISA INVOICE FOR MAINTENANCE FEES

Customer ID       0307
Invoice Number    25969
Invoice Date      Jan 14, 2016
Terms             NET30

The Milford National Bank & Trust Co

PO Box 228
Milford, MA  01757

| Description | Qty | Discount | Unit Price | Ext. Price |
|---|---|---|---|---|
| ARRM Accounts | 1.00 | | 350.00 | 350.00 |
| Maintenance Fees | 1.00 | | 2,960.70 | 2,960.70 |
| Document Management | 1.00 | | 250.00 | 250.00 |

|  |  |
|---|---|
| Subtotal | 3,560.70 |
| Sales Tax | 222.54 |
| Payment Rec'd | 0.00 |
| Late Fees | |
| Current Due | 3,783.24 |

| Current | Total Due |
|---|---|
| 3,783.24 | 3,783.24 |

**For billing questions please call (402) 323-1270.**

** Your prompt payment ensures that late fees will not be applied if paid within 30 days after the invoice date

** Remittance Advice – Detach and return with payment **

Customer ID       0307
Invoice Number    25969
Invoice Date      Jan 14, 2016
Terms             NET30

Amount Due        3,783.24

Amount Enclosed

The Milford National Bank & Trust Co

PO Box 228
Milford, MA  01757

Remit To:    Union Bank & Trust
             ATTN: Controllers Dept
             P.O. Box 82069
             Lincoln, NE  68501-2069
             (402) 323-1190 fax

EXHIBIT "D"

DOCUMENT MANAGEMENT AMENDMENT

## DOCUMENT MANAGEMENT AMENDMENT

This Document Management Amendment (the "Amendment") made this _2nd_ day of _October_____, 2015, is by and between **INFOVISA, Inc.** ("Licensor"), and **The Milford National Bank and Trust Company** ("Licensee").

WHEREAS, the parties have entered into that certain Software License Agreement dated _October 2, 2015,_ as the same may be amended from time to time (the "Agreement"), and the parties wish to amend the Agreement in the manner set forth in this Amendment; and

WHEREAS, Licensor agrees to provide, as available, services set forth in this Amendment and/or attachments thereto (the "Services") pursuant to the terms and conditions of this Amendment, including access to file storage and document management services.

NOW, THEREFORE, in consideration of the mutual promises contained in this Amendment, the parties agree as follows:

1.    **Definitions.** For purposes of this Amendment, the following capitalized terms shall have the meanings set forth below.

   "Database" means the storage method used by Licensor to store and index the electronic files belonging to Licensee.

   "Electronic Document" means the electronic documents or electronic files belonging to Licensee that Licensee intends to store within Licensor's Database.

   "Licensor's Database" means Licensor's file storage and document management database solution, software, and files through which the Services will be provided.

   "Retrieve" means the ability of Licensee to download, print, save, extract, search, and view electronic documents stored using Licensor's Database.

   "Upload" means the moving and converting of Licensee's chosen electronic files through methods determined by Licensor to store the electronic files in Licensor's Database.

2.    **Services Provided**. Licensor shall provide Licensor's Database to Licensee for the purpose of Licensee's storage, indexing, and retrieval of electronic documents. Licensor shall provide reasonable assistance to Licensee in setting up the database on the network of Licensee. Licensor shall provide periodic update scripts and programs to Licensee in the event that changes made to the document management software require such changes. Licensee shall be responsible for running the upgrade scripts or programs at the direction of Licensor. Licensee shall provide sufficient computer storage space to store documents, as well as the means to upload and retrieve the documents belonging to Licensee. Licensor shall not be responsible for network, operating system, or database software maintenance or assistance.

3.    **Fees.**

   A.   The fees for the services provided for by this Amendment are included as Attachment A to this Amendment.

   B.   Licensee agrees to pay all charges outlined in Attachment A or otherwise agreed to by the parties within thirty days of receipt of Licensor's invoice therefor without any setoff.

   C.   Licensor may, at its sole discretion, elect to increase the fees to Licensee for the Services provided, however, that such increases shall become effective on the anniversary date of this Amendment or any renewal thereof. Licensor will provide written notice of any such increase not less than sixty (60) days prior to the anniversary date of this amendment or any renewal thereof.

D. In addition to the fees set forth in Attachment A hereto, Licensee shall pay to Licensor the amount of any sales, use, ad valorem, excise or other similar taxes, or governmental charges (excluding taxes on Licensor's gross ordinary income) paid or payable by Licensor as a result of the execution or performance of this Amendment or with respect to the Services or as used by Licensee. Such amounts shall become due thirty (30) days after billing of Licensor's invoice therefor.

E. Payment for all fees owed and expenses to be reimbursed by Licensee under this Amendment shall become due thirty (30) days after receipt of invoice prepared by Licensor, which shall be prepared monthly.

4. **Delegation and Subcontracting**. Licensee authorizes Licensor to delegate and subcontract for provision of the Services to a third party provided that Licensor shall remain responsible for the performance of all duties under this Amendment.

5. **Term.** This Amendment shall be effective beginning on the date accepted by the President of Licensor and shall continue for a period of twelve (12) months following the first day of the month for which the first bill to Licensee for File Storage and Document Management. Notwithstanding the preceding sentence, in no event shall the term of this Amendment or any renewal thereof exceed the term of the Agreement between Licensor and Licensee.

6. **Renewal.** This Amendment shall automatically renew for additional successive twelve (12) month terms, unless at least ninety (90) days prior to the end of the original term or any renewal term, Licensor gives Licensee, or Licensee gives Licensor, written notice of its intent to terminate this Amendment at the end of the then current term.

7. **Backup of Uploaded Files / Safeguarding Critical Files.** Licensee shall bear sole and exclusive responsibility for backing up all files as well as the database that houses the files accessed by the document management software. Licensee is hereby advised that Licensor does not back up the files or database on behalf of Licensee. In addition to loss of data due to computer failure, files may be lost through deletion by employees of Licensee. Licensor strongly advises Licensee to develop processes and procedures to mitigate the risk of loss of critical files by developing procedures around deletion of files in the software as well as developing a full back up strategy outside of the document management software for critical files. By executing this amendment Licensee is expressing its acknowledgement of Licensee's responsibility in backing up data and files.

8. **File Types Supported.** The Services will allow Licensee to view files of specific types determined by Licensor. The file types supported, in general, will be limited to those that, in Licensor's belief, pose the least risk of computer virus infection. Files will be accessible in a view only mode, with edits to the files not supported in Licensor's Database. In the event that Licensee wishes to make changes to an uploaded file, it may attempt to do so by making a local copy, making the edits, and uploading the modified file. Files currently supported include, but are not limited to PDF, JPG, TIF/TIFF, and GIF. Licensor reserves the right to determine and modify, at its sole discretion, the types of files that will be supported by the Services. In the event Licensor modifies the file types supported, Licensor shall provide written notice to Licensee.

9. **Limitation on Liability.** Licensor's aggregate liability under this Amendment shall not exceed the aggregate sum of fees received by Licensor under this Amendment during the twelve (12) months prior to the act or event giving rise to such liability.



Licensee Initials _____

Licensor Initials _____

Confidential Information

May Not Be Redistributed Without Written Consent of Infovisa

10.   **Effect of Amendment.**   Except as expressly amended by this Amendment, all terms and provisions in the Agreement shall (i) remain in full force and effect, without modification, and (ii) shall control the terms of this Amendment (including, without limitation, terms in the Agreement covering limitations on warranties and liabilities, default by Licensee/Licensee, assignability, governing law, jurisdiction, venue, notices, etc.). Without limiting the generality of the foregoing, all terms in the Agreement applying to the "Software" (as defined in the Agreement) shall also be applicable to the Licensor's Database, except as expressly provided otherwise in this Amendment.

WITNESS the due execution hereof the day and date first written above.

INFOVISA, Inc.
11120 Treynorth Drive
Cornelius, NC  28031

Signed:

NAME:  Michael S. Dinges

TITLE:  President & CEO

DATE:   _10.6.15_

The Milford National Bank and Trust Company
300 East Main Street
Milford, MA  01757

Signed:

NAME:   _Scott L. Sickes_

TITLE:  _Vice President_

DATE:   _10/2/15_

## ATTACHMENT A
### Fees and Charges

**One-time Fees:**
Licensee will be billed a one-time non-refundable fee of $1,500.00 for the set-up of the File Storage and Document Management service. This fee is for database creation and training.

**On-going Fees:**
On a monthly basis, Licensor will determine the number of open accounts on the MAUI trust accounting system. The number of open accounts will be used to determine the billing for the document management system.

Licensee will be billed $250.00 per month for the Services. This monthly fee includes 500 open accounts on MAUI.

Each additional 500 account increment or portion thereof will be billed at the rate of $50 per month to Licensee. The maximum number of accounts open on the system at any point during a given month will used to determine the number of accounts for billing purposes for that month.

**Conversion from Prior Document Management System**
Because document management systems vary widely, any assistance from Licensor to convert Licensee's files from another system will be quoted on a case-by-case basis.

**EXHIBIT "E"**

**WEB AMENDMENT TO SOFTWARE LICENSE AGREEMENT**

## WEB AMENDMENT TO SOFTWARE LICENSE AGREEMENT

This Web Amendment to Software License Agreement (the "Amendment") is made and entered into as of this the 2nd day of _October_, 2015, by and between Infovisa, Inc. ("Licensor") and The Milford National Bank and Trust Company ("Licensee").

WHEREAS, Licensor and Licensee have entered into that certain software license agreement dated as of the 2nd day of _October_, 2015 (the "Agreement"); and

WHEREAS, Licensee now wishes to obtain certain support services so that Licensee and Licensee's clients may be able to access information generated by Licensee through use of Licensor's MAUI software, transmitted by Licensee to Licensor, and linked to Licensee's own internet webpage.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1.     **Definitions.** Unless otherwise specified, all capitalized terms in this Amendment shall have the same meaning given to them in the Agreement. In addition, is the following definition:

    (a)    **Website** means a series of interconnected hypertext mark-up language documents capable of residing on a single host server computer which provides a site for Licensee and Licensee's clients to access information generated by Licensee through use of Licensor's MAUI software and linked to Licensee's internet webpage.

    (b)    **Web Application** means software owned by Licensor, including MAUIWeb, for use with the internet and accessible via a Website.

    (c)    **Website Hosting** means providing hardware, software, telecommunications lines and support services for the purpose of maintaining a Website or a Web Application. Website Hosting shall not include providing hardware support to Licensee for Licensee's network or telecommunications equipment.

2.     **Amendments.** The Agreement is hereby amended in the following respects:

    (a)    The definition of "Software" in the Agreement shall not include the Web Application, which will be utilized by Licensor in Web Hosting. Licensee has no license or ownership interest in the Web Application software, specifically MAUIWeb, of any kind.

    (b)    Attachment A of the Agreement is hereby amended to add the supplemental and additional fees with respect to the maintenance, hardware and support services for Website access, as set forth in Exhibit A, attached hereto, such fees as described in Exhibit A hereto are in addition to the maintenance fee and license fee as set forth in the existing Attachment A of the Agreement.

    (c)    The following shall be inserted at the conclusion of Section 4(E) of the Agreement: "Licensor agrees that information transmitted by the Licensee can only be reviewed by third party technical staff for purposes of maintaining the information to be made available over the Website, internal or external audits, and as required by law. Any information reviewed by third party technical staff shall be subject to a non-disclosure Agreement executed by Licensor and third party technical staff."

    (d)    The following shall be inserted at the conclusion of Section 11 of the Agreement: "Licensee warrants that all data delivered to Licensor by Licensee will be free of any undisclosed feature including, without limitation, a time bomb, virus, software lock, drop-dead device, malicious logic, worm, Trojan Horse, or trap door that is designed to interfere with or harm hardware, network structure, or software of Licensor or its agents. The Licensee will verify any and all back-ups transmitted and assume all responsibility for the accuracy of the information

Licensors Initials

Licensees Initials

transmitted to the Licensor's Website. Under no circumstance will Licensor be responsible for incorrect data or errors of data on the Website, nor will Licensor be in the position to correct such errors."

(e)     Licensee will administer all aspects of access to the Website including establishing and maintaining logins and passwords, and Licensee assumes all responsibility for the same.

(f)     Licensee shall provide to Licensor a copy of its logo in electronic form to be used on the Website.

(g)     All information transmitted, stored, and received, through the internet cannot be assured to be strictly confidential at all times. As such, despite Licensor's commercially reasonable efforts, Licensor does not guarantee or promise the privacy, security, authenticity, and non-corruption of any information transmitted or stored in any system connected to the internet. Licensor shall not be responsible for any adverse consequences whatsoever of Licensee or Licensee's clients in connection to or use of the internet, and Licensor shall not be responsible for any use by customer or customer's client's internet connection in violation of any law, rule, or regulation, or any violation of the intellectual property rights of another.

(h)     Licensor shall take commercially reasonable measures to ensure accessibility of Website to Licensee's clients. Because said accessibility relies upon factors not in the control of Licensor, however, Licensor shall not be responsible for any down time of the Website.

(i)     No additional warranties are made other than those appearing under the Agreement, and all limitations of warranties and liabilities set forth under the Agreement, specifically Paragraphs 12 and 13 shall be applicable to all aspects of Website Hosting.

(j)     Licensee, at its own expense, shall defend, indemnify, and hold harmless Licensor , its agents, affiliates, successors, and assigns with respect to any loss, cost (including reasonable attorneys fees), liability, claim or action brought against or incurred by Licensor, its agents, affiliates, successors, and assigns arising out of or in connection with the operation, condition, or content of Licensor's webpage, the Website, and the information contained thereon, other than any loss, cost, liability, claim or action resulting from licensor's negligence or willful misconduct; any use of internet facilities conducted or permitted by Licensee; the conduct of any business, advertising, marketing, or sales in connection therewith; and any negligent or illegal act or omission of Licensee or any of its agents, contractors, servants, employees, clients, or other users or accesses. Licensee agrees to periodically review data and Website content for accuracy and immediately communicate any inaccuracies to Licensor.

(k)     As required by any applicable Interagency Guideline on customer privacy, Licensor hereby agrees to use commercially reasonable efforts to safeguard and prohibit the improper use of any nonpublic personal information about the Licensee or the Licensee's customers.

3.      **Additional Responsibilities of Licensee.** In addition to those responsibilities contained within the Software License Agreement and others contained in this Amendment, Licensee or Licensee's technical staff shall, at its own expense, be responsible for:

(a) Establishing, configuring, maintaining and troubleshooting Licensee's firewall settings in order to maintain a VPN from its network, through the public Internet, to the network of Licensor.

(b) Establishing, configuring, maintaining and troubleshooting Licensee's firewall settings to allow for SQL Server replication to route and flow through the VPN, which may include opening additional ports to allow SQL and Windows authentication traffic.

(c) Configure, with the initial assistance of Licensor, maintain and troubleshoot the SQL Server replication and security requirements. Based on the size of the database of Licensee, Licensee shall have specific responsibilities as follows:

i.    For databases of a certain size (usually up to 2 GB) outbound connectivity to Licensor's web service on port 443 will be required.

Licensors Initials

Licensees Initials

      ii.  For databases of a certain size (usually between 2 GB and 4 GB) Licensee will be required to purchase, install and maintain a copy of WinZip with a command line add-on.

      iii.  For databases of a certain size (usually over 4 GB) Licensee may be required to provide a site-to-site VPN with outbound connectivity on several ports to Licensor's data center and Licensee will be responsible for configuring Microsoft SQL Server replication according to instructions provided by Licensor to copy the database to the data center of Licensor.

(d)  Test the setup of the website to ensure accuracy of data and success of replication.

(e)  Configure Licensee's main webpage to link to the URL or IP address provided by Licensor.

(f)  For the duration of this Amendment, periodically review the website to ensure that SQL Server replications are being successfully completed.

(g)  Document all necessary information, configurations and steps required in order to maintain all items in this Section 3 and this Amendment. Should Licensee request additional assistance from Licensor, such assistance will be provided at the sole discretion of Licensor and fees, at the discretion of Licensor, will apply.

(h)  Maintain, at all times, a backup copy of Licensee's production MAUI database.

4.    **Additional Responsibilities of Licensor.**  In addition to those responsibilities contained within the Software License Agreement and others contained in this Amendment, Licensor or Licensor's technical staff shall, at its own expense, be responsible for:

(a)  Establishing, configuring, maintaining and troubleshooting Licensor's firewall settings in order to maintain a VPN from its network, through the public Internet, to the network of Licensee.

(b)  Establishing, configuring, maintaining and troubleshooting Licensor's firewall settings to allow for SQL Server replication to route and flow through the VPN, which may include opening additional ports to allow SQL and Windows authentication traffic.

(c)  Provide Licensee the IP address of Licensor's firewall, the IPSEC handshake parameters, the IP addresses of Licensor's SQL Servers, port numbers for communications, and other necessary configuration parameters.

(d)  Provide initial assistance to Licensee in configuring SQL Server to create a distributor, a publication, and a push subscription of Licensee's database to Licensor's SQL Server.

(e)  Provide sufficient Windows and SQL Server security access to the servers of Licensor to facilitate the push replication of the SQL Server database.

(f)  Establish a MAUIWeb website that uses the copy of Licensee's database resident on the SQL Server of Licensor as the source data.

5.    Effective Date of Amendment. This Amendment shall be effective as of the date first set forth above. Except as expressly modified in Section 2 hereof, all terms, provisions, and covenants contained in the Agreement shall remain in full force and effect, without modification.

(Signature page follows)

---

Licensors Initials

Licensees Initials

LICENSOR:

INFOVISA, Inc.
11120 Treynorth Drive
Cornelius, NC 28031

Signed: _____

PLEASE PRINT OR TYPE:

NAME:  Michael S. Dinges

TITLE:  President

DATE:  _10-6-15_____

LICENSEE:

The Milford National Bank and Trust Company
300 East Main Street
Milford, MA  01757

Signed: _____ VP____

NAME:  Scott L. Scales

TITLE:  Vice President

DATE:  _10/2/15_____

_____ Licensors Initials

_____ Licensees Initials

Page 4 of 5

<u>Exhibit A</u>
Licensing Fees, Maintenance Fees and Other Terms

## SOFTWARE/SERVICES PROVIDED:

MAUIWeb hosting services allows Licensee's clients to inquire into account information including history, holdings and other related information as made available to Licensor via transmission of Licensee's database backup files.

## SETUP FEE:

One-Time Setup fees for MAUIWEB are a part of the License Fees outlined in the Software Usage and Application Services Agreement executed of even date with this agreement.

## MAUIWEB MONTHLY MAINTENANCE FEES:

Monthly fees for MAUIWEB are a part of the Monthly Maintenance Fees outlined in the Software Usage and Application Services Agreement executed of even date with this agreement.

Should the number of user accounts (user name/password combination) exceed 300 Licensor reserves the right to assess a $1.00 per month per active administrative and consumer user account (user name/password combination) fee for each user account over 300. Licensee is encouraged to maintain their user accounts via the Administrative Tools, and agrees that Licensor shall have the right to inspect the database to determine the number of user accounts.

## MAUIWEB WEB-STATEMENTS FEES (made available On-Demand):
Should Licensee elect to use this On-Demand service, the following fees will be applied:

| | |
|---|---|
| Monthly Minimum: | $0.00 |
| Statement Minimum: | $1.00 per statement at time of upload for up to 20 pages. |
| Statement Overage: | $0.05 per page at time of upload for statements over 20 pages. |
| Statement Retention: | $0.15 per statement per month if retained for more than 12 months. |

## MAUIWEB CLIENT COMMUNICATIONS FEES (made available On-Demand):
Should Licensee elect to use this On-Demand service, the following fees will be applied:

| | |
|---|---|
| Monthly Minimum Fee: | $0.00 |
| Monthly Communication Fee: | $0.000416 per daily average Kb of data made available for download per associated MAUIWeb login. |

The fees for MAUIWeb Client Communication can be changed by Licensor with 60 days written notice to Licensee.

## ADDITIONAL FEES:
Licensee shall be responsible for costs incurred by Licensor or Licensor's agents in resolving issues caused by viruses or file corruptions transmitted by Licensee to Licensor, as well as costs associated with Licensee conducting port scans or network penetration attempts against networks and systems of Licensor.

Licensors Initials

Licensees Initials